[Civ. No. 17050.   First Dist., Div. One.   May 20, 1958.]

CLIFFORD B. CASSIN et al., Respondents, v. FINANCIAL INDEMNITY COMPANY (a Corporation), Appellant.

632

Theodore Tamba and Franklin A. Plank for Appellant.

Mullally & Wines for Respondents.

WOOD (Fred B.), J.—Plaintiffs brought this action upon an automobile liability insurance policy issued by the defendant, for reimbursement for the amount of the judgment, costs and attorney fees incurred by them in an action brought against them by Pamela Beaumont who was injured in a collision with plaintiffs' car. Plaintiffs' car was being driven by one Earl Van Dyke, who was 62 years old at the time. Defendant claims that its policy bore a "preferred rating endorsement" which excluded insurance coverage "while the automobile is operated by or in the care of anyone who: . . . (2) Is over 60 years of age."

(1) *Was the policy limited by a preferred rating endorsement?  No.*

The complaint pleads the text of the policy (not showing any such endorsement). The answer shows the text of the alleged endorsement but is not verified. Defendant argues that plaintiffs by failing to file an affidavit sanctioned by section 448, Code of Civil Procedure, admitted execution and genuineness of the endorsement. It is possible that section 448 does not apply to a mere addendum as distinguished from an entire instrument. Moreover, defendant by failing to verify its answer may have admitted the genuineness and completeness of the contract as pleaded in the complaint, which was verified. (See Code Civ. Proc., § 447.) It happens that these questions need not be decided. The parties treated the execution and genuineness of the alleged endorsement as issues at the trial. It is too late now for defendant to change its theory in that regard.

There is evidence sufficient to support the finding that the alleged preferred service rating endorsement was not attached to the policy.

Plaintiff Hazel Cassin testified that the endorsement was not attached to the policy when she received it. When applying for insurance, she went to a Mr. Legerton at the office of Fireside Finance Company [agent or broker for defendant herein] and asked to renew her insurance which was then with Norwich. He said he had "another insurance company that was just as good, and he would offer me the same protection, and it would be cheaper." He said nothing about restrictions on the new policy, about different rates in case someone

less than 25 or more than 60 years of age drove, nor did he mention the words "preferred rate endorsement." The application for insurance signed by Mrs. Cassin had "Pref Rat End" inserted in pencil but Mr. Legerton testified that this was not in his handwriting as were most of the entries in the application. The first page of the policy, in a section labeled "Physical Damage" contains a section embraced by brackets labeled "Endorsements Forming a Part of the Policy at Its Inception Date" with two printed entries ("Wrongful conversion—Type WC-1" and SI Coll.—Type VSI-") and a typed entry "PREF. RATE END." On the next line and in the right-hand column, instead of the left, there is a typed entry "Policy Fee End." with a charge of $5.00. There appears to be nothing in the policy which explains the entries under endorsements or intimates that these may restrict coverage under the policy. Mrs. Cassin testified that she saw "Pref. Rate End." notation on the face of the policy but thought it referred to the endorsement fee explanation attached to the policy.

The only contrary evidence on the issue of whether the endorsement was physically attached to the policy at the time it was issued was given by Nelson C. Neall, who at the time the policy was issued was employed by Financial Indemnity Company. He testified that he "would say there was a preferred rating endorsement attached to the policy" because the normal practice was to stamp the endorsements and the policy so that part of the stamp would appear on the endorsement and part on the policy, and this particular policy had two partial stamps on the section marked "Exclusions." He could not, of course, testify that this particular operation had been done in this manner as to this particular policy. Also, there was a notation "pref. rat. end" on the front page of the policy and the office copy of the policy had such an endorsement in the file.

█ Appellant contends the issue was not whether the preferred rating endorsement was *attached* to the policy but whether the parties intended that such endorsement be included in the policy applied for. We doubt that this point is available at this late date. At the beginning of the trial defendant's counsel said he was prepared to prove that the endorsement was attached; that the only issue of fact was whether the endorsement was "on there." Even if this point were now available, we perceive no basis for reversal. Mrs. Cassin testified that she intended to obtain coverage similar

to that which she had under the Norwich policy, which did not contain any such exclusion and that Mr. Legerton, the agent of defendant, purported to provide her with such a policy. One could infer from the "Pref. Rate End." on the face of the policy either that the insurance company's intention was different from that of the insured or that this was mistake on the part of the company. Neither conclusion is compelled by the evidence, and the trial judge resolved any conflict in favor of the plaintiffs.

Moreover, even if the endorsement had been attached it would not have been effective here. The policy expressly provided: "Terms of this policy which are in conflict with the statutes of the State wherein this policy is issued are hereby amended to conform to such statutes." Section 415, subdivision (2), of the Vehicle Code prescribes as a requirement of a motor vehicle liability policy that it "shall insure the person named therein and any other person using or responsible for the use of said motor vehicle or motor vehicles with the express or implied permission of said assured." Thus, the policy (even if the restrictive endorsement were attached) by its very terms amended itself to conform to this statute, which contains no such age restrictions as are contained in the endorsement.

In *Wildman* v. *Government Employees' Ins. Co.*, 48 Cal.2d 31 [307 P.2d 359], the court held that such provision in a policy prevailed over an endorsement purporting to restrict liability to use only by members of the insured's immediate family. Indeed, it is doubtful if it would have been competent for defendant to restrict the coverage as the endorsement would have done if attached to the policy. "Inasmuch as sections 402 and 415 of the Vehicle Code set forth the public policy of this state such laws must be considered a part of every policy of liability insurance even though the policy itself does not specifically make such laws a part thereof." (P. 40 of 48 Cal.2d.)

(2) *Did plaintiffs incur a liability to Beaumont which is covered by the policy they obtained from the defendant? Yes.*

The action of Beaumont against the Cassins and Van Dyke culminated in a stipulated judgment in favor of Beaumont against the Cassins for $5,000 and against Van Dyke for $1,500. Van Dyke's insurer, Farmers Insurance Exchange, paid Beaumont Van Dyke's $1,500 portion of the judgment and loaned the Cassins $5,000 which they deposited

and thereupon paid Beaumont their $5,000 portion of the judgment. Defendant herein questions that transaction, claiming that the Cassins had only an owner's liability under section 402, Vehicle Code, based solely on Driver Van Dyke's negligence, which section 402 imputes to the Cassins; hence the latter's liability could not exceed the amount of the driver's liability. Defendant concludes that the loan transaction was really a payment by Farmers to Beaumont, in discharge of its coverage of Van Dyke's liability.

*First,* it is important to bear in mind that the Beaumont stipulated judgment was the result of a compromise settlement and that the law looks with favor upon the voluntary settlement of doubtful rights and controversies in the absence of fraud. (11 Cal.Jur.2d 3, § 2.) Here, there is no evidence of fraud.

*Second,* with what types of liability were the Cassins confronted when they negotiated this settlement? Beaumont in her complaint alleged two. In one paragraph she pleaded that the Cassins were liable as owners of the car, under section 402 of the Vehicle Code. In another paragraph she alleged that Van Dyke was Cassins' agent, acting in that capacity at the time of the accident. There is evidence that Mrs. Cassin that evening drove this car, recently acquired, over to her friends, the Van Dykes, to show it to them and invited them to ride with her, which they did. They stopped at a bar for a while, taking a few drinks. Upon leaving the bar near midnight, Mrs. Cassin asked Mr. Van Dyke if he would like to drive the car, to see how it operated. He accepted the invitation. Mrs. Cassin sat in the front seat, Mrs. Van Dyke in the rear seat. As they approached the intersection where they wished to make a left turn, Mrs. Cassin was facing the rear, engaged in conversation with Mrs. Van Dyke. Mr. Van Dyke asked Mrs. Cassin if there were any cars approaching from the rear. She assured him there were none and he proceeded with the left turn, immediately colliding with the Beaumont car which was traveling toward them in the opposite bound lane of the street along which they had been driving. This trip, it would seem, was as much that of Mrs. Cassin as it was Van Dyke's, possibly more so. Accordingly, she was potentially liable as principal as well as owner of the car and in addition, perhaps she may have been primarily liable if negligent in her observance of the character and quality of his driving at the time. (See *Souza* v. *Corti,* 22 Cal.2d 454 [139 P.2d 645, 147 A.L.R. 861], as to the liability of a principal,

and *Grover* v. *Sharp & Fellows etc. Co.,* 66 Cal.App.2d 736, 741-742 [153 P.2d 83], concerning the duty of an owner, riding in his car when driven by another, to keep a lookout himself and remonstrate against carelessness of the driver.)

The Cassins were faced with a complaint that alleged serious personal injuries, general damages in the sum of $40,000, and substantial special damages the amount of which Beaumont had not yet ascertained but requested permission to include by amendment when ascertained.

Meanwhile, defendant had refused to defend the Cassins in the Beaumont action, predicated upon Van Dyke's age and the erroneous assertion of the restrictive endorsement which we have already discussed. And Farmers was ready to lend the Cassins the money with which to pay their portion of the proposed stipulated judgment.

Under such circumstances why should the Cassins not settle upon the terms indicated? Defendant has shown us no reason why it was not legally competent and proper for them to do so.

*Third,* what about Farmers' part in this transaction? It has insured Van Dyke against his own liability, which all concede. But its policy also provided that if Van Dyke had other insurance against a loss covered by this policy Farmers would not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bore to the total applicable limit of liability of all valid and collectible insurance against such loss; "provided, however, the insurance with respect to . . . other automobiles under Insuring Agreement V shall be *excess* insurance *over* any *other* valid and collectible *insurance available to the insured,* either as an insured under a policy applicable with respect to said automobiles or otherwise." (Emphasis added.)

Van Dyke, under the circumstances which here obtain, was an insured under the policy which defendant had issued to the Cassins. Such insurance was "insurance available to the insured [Van Dyke]" within the meaning of that expression as used in the proviso in the Van Dyke policy above quoted; limited by the Cassin policy to $5,000 for injury to one person in any one accident. If it should develop that the Cassin policy coverage was "valid and collectible" Farmers would be liable only for the "excess" over $5,000, which excess ($1,500) it paid directly to Beaumont. Why should it not enter into the stipulation which liquidated the amount of Van Dyke's liability in the amount of $1,500 and Cassin's in the amount

of $5,000; pay Van Dyke's portion; lend the Cassins the amount of their judgment obligation; and take from Cassin a promise to repay this loan to the extent of their recovery, if any, from the defendant and treat the promise to pay as cancelled should there be no such recovery? Defendant has shown us no sound reason why not. The decisions upon which defendant relies are so obviously inapplicable to the facts of this case, a detailed analysis of them seems unnecessary.

Defendant argues that because Farmers took from the Cassins a release of all claims, the loan transaction was something different from what it purported to be. We fail to see how or why. That was simply a part of the compromise and settlement which fixed the amount of the liabilities of Van Dyke and of the Cassins at $1,500 and $5,000, respectively, and did not change those amounts nor make them joint instead of several obligations. We note in passing that defendant promised to pay the Cassins all sums which the latter ''shall become legally obligated to pay as damages.'' The stipulation and judgment reduced that to a certainty and matured defendant's obligation to pay. The fact that in order to effect the settlement Cassins borrowed the money and borrowed it from another insurance company that had reasons of its own for lending the money is no apparent legal concern of the defendant.

Another argument tendered is that Farmers had no legal capacity to lend its money, that it can ''invest'' its ''assets'' in the type of securities only that are indicated therefor by the provisions of sections 1170 and 1370 of the Insurance Code. There is nothing in the record to show under what part of the Insurance Code or other statute the Farmers Exchange was organized or by what statute it is governed. Moreover, the sections cited deal with investment of assets in securities which this loan transaction was not. No sound reason has been given why it was not competent for Farmers to lend the money nor what right defendant has to question it.

(3) *Was it prejudicial error to strike certain portions of defendant's pleadings and to refuse the filing of others? No.*

█ The gist of the stricken portions of the answer, and the pleadings later not allowed to be filed consisted of allegations of fraud and collusion of the Cassins and Farmers to mulct defendant by defeating it of its right of subrogation to plaintiffs' claim, if any, against Van Dyke.

At the trial, defendant's counsel agreed that the questionability of the form of payment was raised by the denial of

payment. And it has not shown how its subrogation rights could have been prejudiced by anything that plaintiffs in fact did. In the record we find neither evidence of nor offer to prove fraud or collusion. *Indeed, defendant's counsel during the trial said he was making no such contention. His claim* in respect to the loan agreement *was* that *it would appear, as a matter of law, by examination of the loan agreement* and the *Farmers insurance policy* to Van Dyke that though in form a loan it was payment to Beaumont by Farmers of Van Dyke's personal obligation against the incurrence of which Farmers had insured. Defendant's counsel reiterated that statement at the conclusion of the trial, when the evidence was closed and the briefing period was to start. Plaintiffs' counsel said, there being no evidence of collusion in the case, he was not going to brief that point. Defense counsel responded by saying "that was stricken, and I am not raising the point in the case," adding that he was relying upon the documents mentioned (the Van Dyke policy, the loan agreement and the draft for $5,000 delivered by Farmers to the Cassins) to support his claim that the loan agreement really showed a payment by Farmers, not a loan, a question of law not of fact. In view of that it is too late now to revive the question of fraud and collusion. We have examined those papers and find defendant's analysis of them erroneous.

The same may be said concerning the denial of permission to file a pleading that sought reformation of the contract, so as to restore or reinstate the asserted restrictive endorsement. Moreover, it would not be reformation of a contract were it revised to read as it was not agreed upon, and to impose a restriction which the very terms of the contract would erase and elide so as to conform to California's legal requirements.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.